Mayne's sectarian exclusion discriminates based on religion. Like all discrimination based on religion, it should be subjected to strict scrutiny and held unconstitutional unless Mayne can show that it is necessary to achieve a compelling government interest. Mayne cannot make such a showing, and the First Circuit never held that it could. Instead, the First Circuit held that there are two kinds of religious discrimination, the bad kind and the good kind. The First Circuit recognized that Mayne cannot discriminate against students or schools because they are religious, but it held the state is perfectly free to discriminate against students or schools because they do religious things, such as teach or receive instruction in religion. The First Circuit was wrong. Religious discrimination is religious discrimination, and unless it can survive strict scrutiny, it is unconstitutional. The First Circuit's refusal to apply strict scrutiny based on a supposed status-use distinction was baseless. There is no basis for a use-based departure from strict scrutiny in the text of the Free Exercise Clause, there is no basis for it in this Court's Free Exercise Precedent, and there is no basis for it in common sense. Religious schools, after all, teach religion, just as a soccer team plays soccer or a book club reads books. Yes, it is part of what they do. It is also part of who they are. Of course, religious schools also teach secular subjects and satisfy every secular requirement to participate in the tuition assistance program. It is only because of religion that they are excluded. You can call that discrimination based on religious use. You can call it discrimination based on religious status. Call it what you will. Either way, it is discrimination based on religion, and either way, it is unconstitutional. I welcome the Court's questions. Counsel, neither of the two schools that you talk about, discuss, has indicated that it will accept students who receive state funding or subsidies. So, would you discuss just briefly, then, whether or not you have standing? Absolutely, Your Honor. The First Circuit correctly held that whether or not these two particular schools ultimately will or will not participate was beside the point, because the constitutional injury here is the denial of the opportunity to even seek out religious education under this program. That constitutional injury is directly attributable to the sectarian exclusion, and it is unquestionable that holding the sectarian exclusion unconstitutional would redress that injury. And this Court's decisions in cases such as Northeastern Florida Chapter of Associated General Contractors, Heckler v. Matthews, make clear that when a plaintiff is challenging a barrier, a discriminatory barrier to a public benefit, the plaintiff need not show, indeed, need not even allege, that they would actually obtain the benefit but for the discriminatory provision. In fact, in Heckler v. Matthews, it was a foregone conclusion that if the plaintiff was successful in challenging the discriminatory provision in the public benefit program, he would not get the benefit, because there was a unique severability provision in the program that said, if this provision is invalidated, the benefit goes away. It doesn't get extended to the excluded class. It goes away. This Court held that nevertheless, even though it was a foregone conclusion the plaintiff would not get the benefit, he nevertheless had standing to challenge it. Your Honor, does that mean that if there were only two schools in the state that met the petitioner's religious requirements, so only two schools that the petitioners would go to, would use this money for? And we knew that both of those schools were not going to accept the money or were very unlikely to accept the money. Still, we would say that there was standing? Your Honor, in Heckler, the Court held that even the stigmatic injury of being subjected to the discriminatory treatment in that case was sufficient for standing purposes, even though it was a foregone conclusion that the plaintiff would not get the benefit if successful in his challenge in that case. So the answer to my question is yes, that even if all the schools that meet the petitioner's religious requirements make clear that they're not going to accept this money, we still have a case before us? Your Honor, what I would want to know in that situation is whether the plaintiffs had alleged that they will not go to any other school but these two schools. You also have to remember that this sectarian exclusion has been on the books for four decades, so to the extent there's a dearth of religious schools that are acceptable to the plaintiff in that situation, that's probably attributable to the fact that Manning has been discriminating against schools for four decades. So there's a lot I would want to know there. Would the Nelsons go to any place besides Temple Academy? Your Honor, the Nelsons alleged, and more importantly, Maine stipulated, and this is at the Joint Appendix, page 78, that what they want is an education that aligns with their sincerely held religious beliefs. But I thought they identified Temple Academy as the place that they wanted to send their child. They did. Well, they had been sending their child to Temple Academy, so when it came to high school, they could no longer afford the tuition, they were statutorily entitled to the tuition benefit, but they could not use the benefit at that particular time. Okay, but you're saying that they would be open to sending their child to someplace other than Temple Academy if Temple Academy didn't accept the funds? If Temple Academy ultimately, at the end of the day, did not accept the funds, yes, I believe what they want is an education that aligns with their sincerely held religious beliefs. Do you know whether there are other schools that align with their sincerely held religious beliefs in that way? Your Honor, I suspect there are. Can I point you to a particular school in the record that they would absolutely attend? Otherwise, I can't, but as the First Circuit correctly held, it's the denial of the opportunity to even seek out such a school that is the constitutional injury here. And I should also point out that to the extent Maine is claiming that we lack standing to challenge ongoing religious discrimination based on the fact that some schools at some point down the road might ultimately decide not to participate here, I think the problem here is that we don't know that. Maine's argument is essentially that these schools might be excluded at step two, three, four. The problem is there is an absolute barrier at step one. Maine stipulated, this is at page 79 of the Joint Appendix, that it would be, in Maine's words, futile for our clients to even ask their school districts to pay tuition funds to these schools because they are sectarian. Maine stipulated at pages 90 and 99 of the Joint Appendix that it would be, again, futile for the schools to ask the state whether they could accept tuitioning funds. Why? Because they are sectarian. There is an absolute barrier at step one. Maine wants to say, well, we might do this or that at step two, three, or four that might bear on whether these schools ultimately decide to participate or not. But the problem is we can't even get that answer because they're excluded at step one. On this particular point, I take it the reason is something like their religious beliefs and the school's beliefs. They don't want to have gay students. They can't. They can't have gay teachers. They have to teach that the man is the boss of the woman and a bunch of other things like that. Am I right about that? Your Honor, that these schools hold traditional... I state it roughly right. Your Honor, I don't know that that's... Well, then tell me whether, I mean, what is... I've read this. I mean, is it right or not right? Because I have a question and it depends, but this is not my question. I need to notice this background. There are beliefs that no gay students, no gay teachers, man is superior to woman and a few other things like that. Is that right? Your Honor, I don't know that it's correct to say no gay students. No, I don't believe that's the case. No gay teachers. Do the schools consider that in hiring decisions? Yes. But the Main Human Rights Act absolutely protects the right to do so. There is a provision... So what happens to the temple school if that's their religious belief? They don't want sincerely to have a gay teacher and the Human Rights Act says yes. You have to. What happens? The Main Human Rights Act says the opposite, Your Honor. There is an absolute religious... All right, it says you cannot discriminate on the basis of sexual orientation. Is that what it says? In hiring, there is an absolute protection, Your Honor, for... All right, as though the religious belief is the opposite. Your Honor... Oh, I see. The Main Human Rights Act says the religion can do this. What does it say? I'm sorry. There's a provision that says a religious employer can require that its employees adhere to the religion's tenets. There is an absolute exemption. I see. The Maine neglects to mention in its briefing... And so what's the problem with the school accepting the money? Your Honor, so far as I see it, there is no problem. Maybe there isn't a standing problem. But what's worrying me underlying all this is that there are 65 religions or more in this country, and they believe a lot of different things. And what's worrying me is that if the state must give money to the schools, they're going to get into all kinds of religious disputes. One state says, no, in this kind of a situation, you've got to hire the gay teacher. The other says, yes, the other says no. The other says one thing, the other says the other. And religious beliefs, of course, are very sincere and held very strongly. And so there was a reason why this Court's cases have said, we do not want to get into a situation where the state is going to pay for the teaching of religion by religious, you know, practicing religious organizations. And that seems to me to stick its head up in a lot of different aspects of this case. That's what's underlying my problem. Sure, Your Honor, and I think the Court has already addressed that in Zelman. This program does not fund schools. And if religious schools were allowed to participate, it does not fund schools. It funds families. And not a penny can go to any school but for the genuine private choice of individuals. As this Court held in Zelman, as this Court held in Locke, that private, independent choice severs the link between government funds and religious instruction. Well, let's consider whether that's not the case. Let's say a state has, thinks the schools around the state are, you know, they need better physical facilities. They have a program. They're going to give money to schools so long as they spend it on building. And they're going to give it to private schools, too, because building is good for education there. And they're going to give it to religious schools. But with religious schools, they say, look, you can't use this money to build a chapel. But you can use it for anything else. Is that discrimination against the religious schools? Is it? I mean, it is, but is that okay or not? I suspect the government would very well have a compelling interest in that case, Your Honor, because we're talking about direct institutional aid. And when you're dealing with direct institutional aid, the government is quite literally funding the thing. But here, government is simply doing this. It's providing a benefit, a financial benefit to families. And it's saying, use it where you will, public school, private. Can I ask you, what is the discrimination? I think all parents in Maine are given the chance to send their children to free public secular schools. Correct? All parents can do that. To free public secular schools or to the private school of their choice, Your Honor. Well, wait a minute. Let's take it a step at a time. The ultimate choice is you get a free public education. That's what they're promised, correct? No, Your Honor. So the benefit is defined by the statute. No, no, no. The benefit is if I'm a parent and there's a public school, the choice is send your child to that public school. You get no benefit, right? If you live in a district that has a public school, you do not. So in that case, are you arguing that the state has to finance the parent? Oh, not at all, Your Honor. No. No, because they're offering a free public education, correct? Not for that reason, Your Honor. There is no constitutional requirement as this court held in Espinoza. In that situation, the parent pays for the religious training of their child. If they desire a religious school as opposed to going to the public school, yes. All right. And the district could contract with the school to provide the public education, correct? If the district lacks a public school, then it can contract with a school to send its resident students, yes. Do you take the position that the district has to permit or contract with a religious school? No, Your Honor. At footnote nine in our opening brief, we say the opposite, that in that situation where the government is contracting with a school to educate its resident students, that school would have to provide secular instruction. And the parents have to pay then for the religious training of their children? If they don't want to go to the school with which the government has contracted and they desire religious education, yes. So it's only because the school has, the district has decided to give you money to find a secular education that you say there's discrimination? No, Your Honor. Again, I would return to the statute defining the benefit. I think Maine tries to redefine the benefit as a public education. The benefit is defined in the statute itself. And the benefit is tuition to attend the public or the approved private school of the parent's choice at which the child is accepted. That is the benefit. No, no, no, because you leave out what they say is you can pick any school you want for a secular education. They don't say, because they permit religious schools that don't teach or describe themselves as non-sectarian to receive benefits. These parents are put through the same choice that every other parent in Maine is put through. Either get a free public secular education or pay for your religious training. They're being treated as everybody else is. They are not, Your Honor. In some school districts in Maine, government provides a financial benefit that can be used at the public or private school of the parent's choice. They're getting more than other parents. Most other parents have only one choice. Send them to the public school if it exists, send them to the contracted school that exists, or don't. And that's always true with the school choice program, Your Honor. That was true in Zelman. That program was specific to... And one way to make Justice Sotomayor's point, I think, is to ask whether this is different from a typical school choice program. You know, this is not a state or a locality basically saying, we just love choice. We think everybody should get as many choices as they want. This is really a default program for a very small number of students living in isolated areas where the state has decided it cannot, it does not have the resources to provide public schools. And the state would wish to say public schools for everybody. You know, you go to Portland, Maine, it's just public schools for everybody. The state would wish to do that. It can't do that in communities in northern Maine. So it instead has come up with this extremely cabined program. And I think, you know, one question here is whether we should view that in the same way as a kind of Zelman, we love choice sort of program. A couple points there, Your Honor. Zelman was a program for children in a school district where the public schools were failing. It was because of a lack of opportunity in the public school system that the state provided the benefit. Yes, but it was a district-wide program. This is not working for us. We want to use an entirely different system. That's not Maine's issue here. Well, Your Honor, I think it is. And we should remember that for more than a century, Maine allowed religious schools to participate in this program, which belies the whole notion that this is a substitute for a public education. For a century, religious schools could participate. And for a century, that was fine. And there were secular options and there were private options. There were public options. There were private options. There were options in Maine. There were options outside of Maine. In 1980, the state does a reverse course based on an erroneous interpretation of the Establishment Clause that says, you know what? No longer can you attend, yes, we'll continue to send you to Miss Porter's or Avon Old Farms, but don't you dare think about going to a Jewish faith school or an Islamic school or your local Catholic parish's school. For a century, that had been fine. This was not about providing a substitute for a public education. This was about a turn in 1980 based on an erroneous interpretation of the Establishment Clause that for some reason, if it wasn't clear after Mueller, if it wasn't clear after Witters, if it wasn't clear after Zobrist, if it wasn't clear after Zellman, that that was wrong. It was certainly clear, well, it certainly was clear after Zellman. Yet the state continues to stand by this case. Can I take you back to Justice Breyer's point and also the Chief Justice's hypothetical? You said, well, there's this strange use status decision and we all know that doing religious things is just as protected as being religious and of course, nobody would argue with that. I mean, you couldn't put somebody in jail for being religious and you couldn't put somebody in jail for doing religious things. Nobody argues that. The status use concept is really a concept that applies in subsidy cases and what it has been intended to say is that the state generally doesn't have to subsidize exercise of a right. We can't put you in jail for saying something. We also can't deprive you of an unrelated benefit for saying something. We can't say you don't get food stamps because we don't like your speech. But that doesn't mean we have to pay for your speech and we do that all over the place in constitutional law. We do it in the free speech clause. We do it in other areas as well. And so the question here that the status use distinction raises is why is religion different? Why does the state have to? Not like some states want to but this state doesn't want to. Why does the state have to subsidize the exercise of a right? Your Honor, this is not subsidizing the exercise of a right. It is conditioning the availability of an otherwise available public benefit on the surrender of a constitutional right. As this court held in Thomas, the government cannot compel a citizen to choose between exercise of a right protected by the First Amendment and participation in an otherwise available public program. And there's no question that these... The state can define the nature of the program. So just like the state defines the nature of the program in a case like Rust v. Sullivan and in countless of other of our cases, so here the state is defining the nature of the program and saying for various of the reasons that Justice Breyer gave that we just... We don't want to define the program so broadly as to raise all these questions of religious favoritism, religious division and so forth. Your Honor, in a program like Rust or Regan for that matter, which the United States briefs extensively, you're dealing with government speech, first of all. This is not a government speech program and no one can credibly claim it is. To the extent it is government speech, however, as this court made clear in Pleasant Grove, the establishment... Government speech must comport with the establishment clause which requires neutrality toward religion. Moreover, in Rust, the doctors were not forced to choose between receipt of the benefit and the exercise of their right to engage in abortion counseling. They just couldn't use the benefit to do it. Here, you are forced to make a choice. You can get your statutorily entitled benefit to attend the public or private school of your choice or you can exercise your free exercise right. You cannot get both. On that, I believe the government's response, and I think this is what Justice Kagan is getting at, is in Rust, the question is whether you're put to a choice. Here, the government says there is no choice that you're put to because individuals can still educate their children in religion by sending them to, I think it's after school programs or Saturday or Sunday programs. What are your thoughts about that? Well, Your Honor, the court in Espinoza held that parents have a right to direct the religious upbringing of their children and that many parents exercise that right by sending their children to religious schools which is protected by the Constitution. So there's no question that parents have a constitutional right to send their children to a religious secondary school. Now, in making that argument that somehow this is all okay, this discrimination is okay because you can go to a weekly Bible study, number one, that's insulting to parents who are in the position of determining what's an appropriate religious education for the child. But it also ignores the excluded activity. In Rust, the excluded activity was abortion counseling. You could still do that. In Regan, it was substantial lobbying activity. You could still do that simply by adopting the 501c3c4 designation. In Locke, the excluded activity was a degree in devotional theology, which the court noted Joshua Davy could still do and still get the promised scholarship. Here, the excluded activity is a religious secondary education. You cannot get that if you get the benefit. Does this affect different religions differently, the government's argument? I mean, some religions might find a Sunday school perfectly appropriate. Others perhaps may not. I think it does affect different religions generally and differently, Your Honor. And I think this also goes to the Establishment Clause problem here. The fact of the matter is some schools that are religious in what the government would call status, perhaps that do some things that look religious, are allowed to participate. But there is a regulator in Augusta, Maine, who looks into the curriculum and the activities of the school and sits in judgment on whether that school is sufficiently irreligious and therefore a permissible choice for a parent or too religious and thus sectarian and excluded as a permissible choice for the parent. Put aside the Free Exercise Clause problem. That is a substantial Establishment Clause problem, as Judge McConnell makes very clear in his amicus brief. Well, I don't know if you can think about it at this level or advance my thinking on it. What we've seen, of course, is the religious clauses are there to prevent the religious wars. You teach your religion, I teach mine. And to our children. When you get to education, the route you're taking is not unknown. France takes that route. And you could say, well, the state will pay all the religious education as well as all the secular. And treat everybody alike. We've never taken that, really. The opposite is none. Don't pay the priest's salary. And don't pay the teaching of devotion. And some, you know, the teaching of actually devotional activity. And then there's the middle, where say, give the money to the parents and let them choose. Okay. So what this is, is it's closer to the second. I mean, it's closer to the first. The state's going to pay for it. And the reason I think we've stayed out of that is because we have too many religions. 60, 70. And they're going to get into too many arguments with each other about everything under the sun. And you start getting into arguments about whether it should be like this way in the window or the other way in the window. Or this is the kind of thing to teach without it. It's really awful. I mean, I'm not saying the arguments are bad. I understand them. But you get the state in as the arbitrator or the courts. And you're right in the middle of religious activity. So as I look at these cases in bulk, not the exact words, I see a big push with our 60 or 70 religions towards keeping the state out of it. And so that is a theme that probably influences the way I approach these problems. I'm not saying I'm right. I'm asking you because I want to know what you have to help me. Or what do you want to say? Well, Your Honor, going back to your three approaches, I respectfully disagree that this mirrors the first approach. This is the third approach. Provide the money to the family and let them decide. And as this court held in Zelman, as this court held in Locke, that private choice severs the link between government funds and religious instruction. So to the extent there is any advancement of a religious mission, that's attributable to the choice of a parent. It can in no way be attributed to the government. Your Honor. The problem is the government's paying for it, right, directly. But it's paying. And they say, one church says, my God, you certainly cannot pay for a classroom that's of this size because we're using it to worship. And it has to be bigger than that. And the others say, that's just what you shouldn't do. Worship is private and you should have a smaller space for it. And then they're going to have to articulate. And ultimately, well, of course, the parents can choose which of those two is paid for by the state. And they start suing each other. There's government money here going. Your Honor, as this court held in Zelman, any constitutional test that would turn on supposed avoidance of, let me rephrase that. When you're dealing with a program of individual choice, the possibility, what the court called the specter of divisiveness, religious strife, does not bear on the constitutional analysis because of the fact that it is an individual. No one would suggest that a Social Security beneficiary couldn't tithe to her church because that would somehow be funneling government funds to religion. Her private choice as to where to use those funds is her private choice. You cannot refer to them as a number. I mean, you cannot insist that the Social Security Administration refer to you by name rather than a number. Forget it. I mean, Zelman was a case in which the question was, could a locality implement such a program? And the question here is different. Does the locality have to implement such a program? And what we have often talked about in our First Amendment religion cases is this idea of play in the joints, that not everybody has to follow the same model and that there is some amount of funding which is neither prohibited by the First Amendment nor commanded by the First Amendment. And essentially what Mann is saying here is like, oh, well and good if a locality or if a state wants to do this, but we weigh the interests differently and shouldn't we be allowed to weigh the interests differently? Your Honor, the quintessential play in the joints is whether or not to have a school choice program. We know the Establishment Clause allows it. Mr. Chief Justice, may I finish? Finish your thought. Okay. We know that the Establishment Clause allows it, Zelman tells us. We also know that the Free Exercise Clause doesn't require it. In Espinoza, the court held a state need not subsidize private education. Whether to have such a program is the quintessential play in the joints. The point here, I suppose, is this, is that some states would, you know, have such programs and love them. And another state says for the reasons that Justice Breyer gave, you know, we think that this would be incredibly divisive in our community. And you can think of a wide variety of reasons why that would be. It would lead to great entanglement. It's not good for the religion itself. Or other people in our community won't understand why we're funding this program. I mean, these schools are overtly discriminatory. They're proudly discriminatory. Other people won't understand why in the world their taxpayer dollars are going to discriminatory schools. For any of a number of reasons, a state can say, we don't want to play in this game. And the question is, isn't this play in the joints idea, wasn't it specifically understood to allow different kinds of solutions in different sorts of areas? Mr. Chief Justice, may I, my time is well. You can answer the question. Thank you, Your Honor. In Espinoza, this court specifically rejected any test that would turn on weighing the benefit and the exclusion against some general state interest in avoiding religious conflict. I mean, I think the court has already rejected any such test when you're dealing with a program, at least one, that operates and turns exclusively on the private choice of parents. It might be a different situation if we were talking institutional aid, but not in a program like this, Your Honor. Thank you. Just one additional question, request. Could you articulate for me your best distinction of Locke before you get to the argument that you think it should be overruled? Yes, Your Honor, absolutely. So, as Espinoza and Trinity Lutheran held, Locke really does need to be cabined to its facts. And so let's look at those facts. Students could attend religious schools, including what the court called pervasively religious schools. They could take devotional theology classes, including compulsory classes in such things as spirituality, evangelism, Bible, and religious doctrine. The one thing, and the only thing they could not do, was pursue a major in a degree for entry into the ministry, for basically the instruction of future clergy. Even then, however, a student was not required to choose between receipt of the benefit and pursuing a devotional theology major. As the court noted in footnote four, they could do both. Now let's look at the facts of this case, miles apart from Locke. This is not a situation where, as Locke put it, government's going a long way toward accommodating religion. It is a wholesale exclusion of religion. If a school teaches a single class in religion, or doesn't even teach any religion, just teaches secular subjects, if it happens to teach those secular subjects through what a regulator in Augusta determines to be the lens of faith, that school's out. So the exclusion is completely different. Moreover, Locke and Joshua Davey was not forced to choose. Here, parents must choose. So what if the state has funding vocational education? They've got a school for kids who want to learn the trades. They've got one for kids who want to learn the fishing industry. One for kids who want to focus on tourism. And a seminary that prepares individuals to be priests or pastors. Can they decide not to fund the seminary? Your Honor, I think, so long as Locke remains good law, yes. And moreover, in the program Your Honor described, it sounded like it was a direct institutional aid type program. And I think even more so than in Locke, the state could make that choice. Thank you, Counsel. Justice Thomas? Justice Breyer? I have one follow-up. I have a great deal of difficulty here. I think, following up Justice Gorsuch's point, and your own, that you admit that the reason why this school is important to these parents is because they don't teach just secular subjects. That they teach all subjects through the lens of their religion. Am I correct? Religion is a part of the curriculum, yes, Your Honor. I thought, if I understood the materials from the schools that were here, that the very point is that they teach all subjects through the lens of the religion. And I repeat, even their science courses are limited in their reach because of their belief or disbelief in certain theories of science. I don't know that there's anything in the record on that, Your Honor. And to the extent the state desires to say, hey, if you're going to participate in this program, or if you even want to be an approved private school to operate at all in the state of Maine, you have to teach certain curriculum and you have to teach the theory of evolution. That's okay. Is it okay to say to a school, you have to take every student and not discriminate on the basis of sex, color, religion, that they don't practice your religion? The student. I understand that there's an exemption in Maine for who they hire to teach. But if this program is supposed to, which I think it is, to give students a choice, is this program permitted to say, with respect to the students, if they meet your academic requirements, you can't discriminate? Well, Your Honor, that's not this case. But could the state do that? I think you're looking analytically at a totally different situation there because at least on its face, that's a religiously neutral requirement. Now, could there be some evidence of a discriminatory object in the adoption of that provision? Perhaps. But at least it's facially neutral, which means if it's neutral, you're not even getting strict scrutiny at that point. Moreover, I would say, Your Honor, it's important to remember that schools that welcome students of all stripes, that do not consider sexual orientation or gender identity in hiring, in admissions, or for any other basis, are just as excluded from this program if they teach that message of inclusiveness and diversity through the lens of faith. And there's record evidence of that in the Kent School. Justice Kagan? Justice Gorsuch? Yeah, I just want to follow up on that. I just want to be clear in my mind that we're not being called upon today to interpret Maine's anti-discrimination laws, and we don't need to do that to decide this case. Not at all, Your Honor. Maine has never said these schools will be excluded. And the Kent School example, that was a religious school that actually applied, as I remember, just correct me if I'm wrong, to participate but was rejected even though it said it was not a sectarian school and said that it was willing to abide by the Maine's anti-discrimination laws. In the record, I don't know whether it specifically talks about the Maine Human Rights Act at that point because Maine excluded it solely because it was religious. This goes back to the step one absolute barrier. But if you get on to the Kent School's website and look at its policies regarding employment and admissions, it's plain as day. The school does not discriminate on any of the grounds we're talking about. So religious schools are forbidden regardless whether or not they're going to participate. Solely because they are religious. Two questions about how far your argument goes. With respect to Locke, to follow up on the Chief Justice's question, you're saying that that is limited or could be limited to cases involving the training of clergy. Is that an accurate description? Well, Your Honor, I think the court itself limited it in that way in Locke itself. The court went so far as to say the only state interest, the court's words, that we're addressing is the state's interest in not funding the training of clergy. So I think on its own terms, it's limited to that. Okay. And then second, just to clarify, you're not arguing, but correct me if I'm wrong, that the mere funding of public schools would entitle the parents to funding for religious schools. You're saying, but correct me if I'm wrong, that once the state starts funding private schools, it can't exclude religious private schools and fund secular private schools. Is that correct? That is correct, Your Honor. We are not arguing that there is a constitutional right to a publicly funded religious education, nor could we. Espinoza said, point blank, a state need not subsidize private education. Okay. Thank you. One follow-up on the same lines as Justice Kavanaugh. I gather in drawing the distinction that Zellman drew between choice and direct funding, that you would concede that if Maine retooled its program so that payments went directly to private schools, like say to Ms. Porter's, you know, we will pay you X number of dollars to reserve 40 seats in each class for students from districts that lack a public school. You're conceding, I take it, that in the case of that kind of direct subsidy, there would not be a problem with Maine not subsidizing a private religious school as well. Well, Your Honor, in that situation, what I'd want to know is whether the, so we're talking about basically a per capita program where payment is to the institution, but it's determined on a per student basis of how many students the district is sending. Well, I'm just trying to press on how important to your argument this severed link is, where the money is going to the parents and then going to the school, as opposed to we'll just pay you a flat rate whether 40 students enroll or not. We want 40 seats for students that lack a public school in their district. If we're bringing choice out of the equation and we're talking about a direct institutional aid type program, then we're talking about a much, much different case, Your Honor. And when you say much, much different case, are you talking about then a case where there would not be a free exercise claim that could succeed? I think if the government's paying a flat rate to schools, that doesn't turn on whether a student is choosing to attend that school. I, you know, again, I would want to know the particulars, but I think that that would be permissible in that situation for the state to say, we're not going to pay a flat rate. We're not going to contract with a school that's providing religious instruction. But there are a lot of variables there, Your Honor. I understand. If the payment is based on defraying the cost of tuition for the number of kids. No, I understand. I'm just clarifying that you're not defending the notion of that kind of direct subsidy, as opposed to saying that this program functions like choice, like a school choice program, particularly given that kids can go as far as California and to elite boarding schools all over the country with the money. Not a penny flows to any school under this program, but for the private and independent choice of families. Thank you. Thank you, Counsel. Thank you, Your Honor. Mr. Cobb. Mr. Chief Justice, and may it please the Court. With respect to justiciability, this case is now about one family who wants to send one child to one specific religious school. The record clearly demonstrates, though, that this one school has zero interest in taking Maine's money. Under well-established principles, the petitioners do not have standing, because even if they were to prevail, they would receive no redress for their alleged injury. As to the merits, Maine law entitles every child to a free public education. Maine's highest court has recognized that the tuition program at issue here is intended solely to ensure that those few children who live in districts that have not made appropriate schooling arrangements are still able to receive a free public education. That is the benefit at issue here, a free public education. That private schools are sometimes enlisted to deliver the benefit is of no constitutional significance. States frequently outsource the delivery of public benefit programs, and that does not change the public nature of the program. It should be no different when it comes to education. The reason that schools that promote a particular faith are not eligible to participate is simple. Maine has determined that as a matter of public policy, public education should be religiously neutral. This is entirely consistent with this court's holdings that public schools must not inculcate religion and should instead promote tolerance of divergent religious views. The petitioners want an entirely different benefit, instruction designed to instill religious beliefs at taxpayer expense. They are not being discriminated against. They simply are not being offered a benefit that no family in Maine is entitled to. Coming at this from a different perspective, this court has made clear that the government is entitled to define the scope of a financial benefit in order to advance its own value judgments, even when doing so might disadvantage activity protected by the First Amendment. If the federal government can provide funding to family planning services on the condition that it not be used to discuss abortion, a state should be allowed to condition paying a child's tuition on the condition that the school not promote religious beliefs. Counsel, in Maine, can a parent decide that they simply do not want to send their child to any school at all? They could homeschool the child. No, I mean zero education. No, no, there is compulsory attendance laws. So you require them to go to school, and in certain areas you don't have schools available. That's correct. So if you require them to go, and you don't have schools available, and you make provisions for them to comply with that compulsory law, then how could you say that going to a particular school is a subsidy?  You say you require them to go to schools to do something that you haven't provided for. But then you make a way for them to do that, and you now say it is a benefit or a subsidy. But it is you who required them to do it. In certain places you can provide them with a public school, and in other places you can't. But they still have to comply with the law. Yes, Your Honor, but this Court has made clear that states have a legitimate interest in compulsory education laws. Well, I agree. I understand that. I'm not arguing with that, but you have required them to go. It's one thing if you said, look, we will pay for your attendance at a particular college, at the University of Maine, but we won't pay for you to go to a religious college as a substitute for that. You don't have a compulsory requirement that anyone attend college, but you do for primary and secondary school. And I just want you to explain to me how that is a subsidy if you require them to attend, but you make no provisions for it. Well, Your Honor, in this case, what the benefit that's being offered is a free public education. And so the Maine legislature has decided that it's critical that every student in Maine obtain, if he or she wants it, a free public education. And so the state has made certain provisions. It requires school districts to make provisions to ensure that every child gets that benefit. In certain cases, though, I don't know how it can be a benefit when you've required it. I'm not saying it can't be a benefit. I think it's a benefit, but you require it. It's a requirement. Anyway, I'm not going to belabor that. But I am interested in you explaining to me what your term rough equivalent of a public education is. What do you mean by rough equivalent? So in the state's view, Your Honor, the most significant and defining feature of a public education is that it is a sectarian education that is religiously. And what do you mean by that? So what we would consider is an education that doesn't promote one particular set of religious beliefs at the exclusion of others. So a school that might teach about different religions, but doesn't instruct students that they are to follow any particular religion. So it's neutral and silent when it comes to what religion a child should follow. So let's say I'm in Bangor, Maine, and I'm in a public school. Where is it written in the charter of that particular school that it be nonsectarian? It would seem to me that your interest would be on academic subjects. Well, I mean, Your Honor, if I understand your question, this court has recognized that public schools must be secular. No, I think as far as education, you wouldn't care. If you're in a public school, religion doesn't come up. It's a non-issue. Well, religion doesn't come up because it can't come up. I mean, that is the very defining feature of a public school, is that it doesn't have mandatory prayer. It doesn't have mandatory worship services. No, but that's not the reason you go. I'm trying to figure out, when you say that there are these features of a public school education, I don't think you go if you're in a public school in Maine. that your interest is in it. Oh, I'm so glad I'm here because you don't have a lot of Catholicism here. I think you go for other reasons, and I'm trying to figure out. So when you say a rough equivalent of that, what are you talking about? Again, a rough equivalent is an education that is religiously neutral. That is the defining feature of a public education. That is the education that the state wants to provide to children. Now, if families and children want a different benefit, if they want an education that inculcates religious beliefs, that's their right. Suppose parents want to send their child, using this money, to an elite private school, Exeter, Andover, Miss Porters. That would be okay, right? Yes, those schools would likely be approved. And they would provide a rough equivalent of a public education? Yes, they would. They would? Yes. The defining feature of a public education is that it's religiously neutral. Now, you could go to Andover. So when you say a public education, all you mean is a secular education. That's what you mean. That is the defining feature. And what I would say, Your Honor, is that if you went to... You have to have a compelling interest in providing a purely secular education in the schools to which these students wish to go. Your Honor, if you went into any private school, even take Andover Academy, I mean, certainly there are going to be trappings there that are going to be much different than trappings in a public school. But at the end of the day, your chemistry class is going to be taught the same as a public school chemistry class. Your science and math classes are going to be taught the same way. And the one thing that's not going to be occurring in those schools is that they're not going to be inculcating children with a particular religion. So, yes, an Andover or a Phillips Exeter may be different from Bangor Public High School in many different ways. But what they share in common is the most important feature, which is that they are not inculcating religion. So, counsel, I'm sorry. Let's suppose you have two schools. School A is run by religion A. And that religion has a doctrine that they should provide service to their neighbors. So they're running, set up and running a school. But there's nothing in their doctrine about propagating the faith or whatever. So it does look just like a public school, but it's owned by religion. Religion B also has a school, but its doctrine requires adherence to educate children in the faith. And the school is infused in every subject with their view of the faith. Now, would the first school get the funds? Yes. OK. Would the second school? No. And that's because of the difference between the two religions, right? That's because their program is specifically instilling and promoting religion in students. Right. And the other religion does not. That is correct. So you're discriminating among religions based on their belief, right? No, I would not say that. Religions can have whatever belief they want. But if they want to take part in Maine's tuition program, the education service they have to provide has to be the service that Maine is purchasing. Well, and one religion says that's what they do with education, and the other religion says, no, we use it to propagate the faith. So it is the beliefs of the two religions that determines whether or not their schools are going to get the funds or not. And we have said that that is the most basic violation of the First Amendment religion clauses, for the government to draw distinctions between religions based on their doctrine. Again, Your Honor, we're not drawing those distinctions based on doctrine. We are drawing those distinctions based on what the school is going to promote. And let me just give you a hypothetical. If there were a school that was run by an organization that felt it was critical to have part of the program be to inculcate religious beliefs, if that school otherwise provided a public education and, let's say, it had chapel services and a class that was intended to instill religion, if those classes were optional, it's likely that that school would be eligible for the Maine tuition program. What the state is not going to provide public funding to is a school that is going to require students to take part in programs that are intended to instill religion. Well, to follow that up, you said likely. I mean, are we supposed to put weight on that in deciding the case, that that is, in fact, what's going to happen? Well, Your Honor, what we have in this record, we have a facial challenge and we have an as-applied challenge. And the as-applied challenge relates to two very specific schools. And it's completely clear from the record that those two schools are not of the type of the school that I'm hypothesizing about. And so if we ever had a school like that, the Department of Education would look carefully at it. But, you know, I think you'll see it in the record that one of the questions the department has asked in the past is, I see you have a chapel service. Is that a mandatory chapel service? OK. So let's say the school is, you know, some subjects are more susceptible to religious infusion than others. So half of the classes are religious. You know, when they teach literature, it's from a religious perspective. You know, when they teach calculus or chemistry, it's not. So what do they do? Do they get the full amount of the credit or do they get half the amount? No, this is, I mean, what Maine is doing is it's paying the tuition for that student to attend that school. This isn't the kind of program where we can segregate out certain funds to go to one part. OK. So you make a judgment of whether the school qualifies and you look at how much, how serious are they about infusing the subjects with religion? Not how serious they are, Your Honor, but. To what extent they do? So and what I will say is that the schools self-identify themselves. This is not a situation where you have government officials. OK, a school comes in and says, I identify myself as a 50 percent sectarian school and a 50 percent non-sectarian. They get the full credit. We would ask them, what are you doing as part of the sectarian portion of your program? And if that portion of the program is designed to instill religious beliefs and students are required to attend that part of the program, then it's unlikely that that school would be eligible for any portion of the tuition. Well, I notice I think we've gone from likely to unlikely. Are you saying that if they just had one chapel service every day or let's just say that they take a religious perspective on history? Just that. Are they going to likely be qualified or unlikely? So, you know, these are hypotheticals that the Department of Education would have to look at. But what I can say is that if a school had a mandatory chapel service where this was a religious chapel service. Let's skip the chapel service and say it's just mandatory history class. But they have a particular view of the Crusades that not everybody might share. You know, Your Honor, as I sit here today, I cannot answer that question. That would be a much tougher situation. It's one that's never presented itself in Maine. And what we have here are two schools that are very much different from those kinds of hypothetical schools. It might be that there could be an as applied challenge brought down the line. If you had a school come forward like Your Honor is speculating about, and we denied funding for that school because we didn't like the fact that religion was taught or that the Crusades were taught from a particular perspective. That school could easily bring a challenge. And then a court would decide whether what Maine did is appropriate or not. But what I don't think is appropriate is for the court to decide the case based on hypothetical situations that have never occurred in the state. Well, suppose that a school is affiliated with a religious group. And they say we do infuse our religious beliefs into all aspects of the community. But our salient religious beliefs are that all people are created equal and that nobody should be subjected to any form of invidious discrimination and that everybody is worthy of respect and should be treated with dignity and that everybody has an obligation to make contributions to the community and engage in charitable work. Those are our religious beliefs. And we don't really have any dogma, but these are principles that we think our students should keep in mind consistent with the religious outlook of our community. Would that school be disqualified? So, I mean, that would be very close to a public school. Public schools often have a set of values that they want to instill. Public service, be kind to others, be generous. I think what the defining feature or what would make the difference is whether children are being taught that your religion demands that you do these things. Then you really are discriminating on the basis of religious belief. What I described is, I think, pretty close to Unitarian Universalism, isn't it? And that is a religious community. So that would be okay. That religious community is okay. They can have a school that inculcates students with their beliefs because those are okay religious beliefs. But other religious beliefs, no. Is that what Maine is doing? Well, what I'm saying, Your Honor, is that, and again, this is what I said in response to the Chief Justice's questions, is that we have two schools here at issue. There are other schools that could come in the future that are going to pose thornier questions. And again, those might be challenges that could be brought at that point. So, you know, I can't sit here and tell you whether or not the Department of Education would approve a Unitarian school. We would just have to know more information about what their curriculum is and how they're teaching it. It would be a process where they... Well, unless you can say that you would treat a Unitarian school the same as a Christian school or an Orthodox Jewish school or a Catholic school, then I think you've got a problem of discrimination among religious groups. Regardless of the religious group that is affiliated with the particular school that is at issue in the case before us. So part of the challenge here, I think, you know, is in part the definition of religion itself. And that is an issue that this Court has struggled with over the years in cases like IRS tax exemptions and conscientious objector status. And so questions always come up about whether is this thing a religion or is it something else? And I think that most people, you know, would believe that Unitarianism is a religion. It might not be premised on the existence of a supreme being, but I think most people would agree that Unitarianism is a kind of religion. I might be wrong about that, but I think that Unitarianism is commonly considered a religion. And so if that is the case, then a school that is promoting Unitarian beliefs would not be eligible for the program. Counselor, my understanding of the record is that this theory that Ms. Porters and the Cates School in California provide a public education or rough equivalent to one in Maine is a relatively recent phenomenon that before, I believe, it was 1980, Maine did allow local religious schools to participate in this program and that it changed course only because of a perhaps mistaken view about establishment clause precedence and that the Maine Supreme Court found that that was the only reason why Maine changed course. So isn't this whole discussion of rough equivalent of public schools something of a post hoc justification? It's not, Your Honor. It is true that there was a time period when religious schools were eligible for the program. The Attorney General authored an opinion, which I think most scholars in courts at the time would have concluded was accurate. Well, I don't doubt it was in good faith, but you'd agree that that was the reason why Maine changed course. That was the reason, but I think what's significant is that after Zellman came out, the Maine legislature understood that maybe that they could include religious schools in the program and so there was debate about whether to remove the religious exemption. And if you look at the statements made during the debate, it's clear that the legislators who were opposed to removing the exclusion had interests different than establishment clause concerns. They had concerns about making sure that a public education is religiously neutral, that it's inclusive, that it's not discriminatory. So there were debates after the Attorney General changed position, but the change was due to the Attorney General's opinion. Is that right? That was the change that was made in 1981. I do want to understand this theory. So a private entity can provide a public education in Maine? Yes. A private entity in California can? Yes. It just can't have too much religious entanglement? It's not that it has too much religious entanglement. Well, some might be okay, but some might not, I believe is your answer to the Chief Justice. The ones that would not be okay are the ones that are instilling religious beliefs in children. Okay. How does that not discriminate against minority religious viewpoints or ones that are unorthodox? Because some favor religions that are more watered down, some might say, or more majoritarian, more comfortable with what a bureaucrat in Bangor might say. I don't see that that's an issue at all. This isn't an issue about how watered down the religion is. This is an issue just about whether religious beliefs are being instilled. Whether those are watered down religious beliefs or more vigorous. I thought some were okay, but there comes a line. No, there is not a school that instills religious beliefs that would be eligible for our program. Thank you. Justice Thomas? I would like to ask you, because Mr. Binder said, which is leaving my views out of it, but this really is the same as Zellman. In Zellman, the state provided tuition money so that the children's parents could choose what religious school to go to. That's pretty much, I think, my recollection is. So what's the difference here? The parent chooses a school and the state supplies the money. So the first important point is that Zellman was about what a state is permitted to do, not what a state is required to do. So in Zellman, this court said that it was permissible for the state to allow the school vouchers to be used at religious schools. But the other significant aspect is that in Zellman, the state was providing a program for parents who wanted to opt out of the public school system, for parents who wanted to send their kids to private schools because of a failing public school system. In Maine, our tuition program is part and parcel to our public schools. It's available for that very tiny percentage of kids who live in districts who otherwise wouldn't be able to receive a public education. It is only those children who are allowed to participate in this tuition program. So for you to basically win, it seems to me you would have to fall within what Justice Kagan said is this area where the state has a degree of leeway. Is that right? Yes, I think there's two ways that we win. I think the first way we win is if the court agrees that this is part of Maine's public education program. And then I think the other way that we can win is if the court agrees that when it comes to spending programs, just like with free speech, the state is allowed to use its pocketbook to promote the values that it has decided it wants to promote. And so this is a spending program, and what Maine wants to advance is religious neutrality. We want schools to be neither for nor against any particular religion. Well, on that point, suppose a school inculcates a purely materialistic view of life. Would that be okay? So, I mean, this is something that we've thought about, and I think there are other aspects of what a school could do that would be inconsistent with a public education. Now, what the Maine legislature had in front of it was it had a set of sectarian schools and it had a set of secular schools, and the one thing that the legislature knew is that it did not want to have schools that inculcate religion as part of the public education program. Now, it's possible that, you know, down the road some school might pop up that is teaching something else, not religion, but something else, say Marxism or Leninism or, you know, white supremacy. Clearly, those kinds of schools would be doing something completely inconsistent with a public education. But as of now, that would not prohibit a parent from getting funding to send a child to one of those. So, because those are hypothetical situations that the legislature has never had to confront, it hasn't addressed that in the legislation. But there's no doubt, Your Honor, that if a white supremacy school tried to participate in Maine's program, the legislature would swiftly act to say, no, you know, beyond being religiously neutral, you also can't teach principles of hatred. I understand that. But as of now, the only thing that you want to make sure that the schools that are covered by this cannot do is that they can't inculcate religion. Even if it's a religion that promotes tolerance of all religious beliefs. If it's religiously based, no. Again, I mean, I don't want to quibble with words, but it's not just that it's religiously based. It's that it's instilling religion in the children who attend to that. And that is because that is the defining characteristic, and I think this court has recognized that that's a defining characteristic of a public education. And so that is the thing that the legislature has controlled for, because that's what actually exists on the ground. We actually have schools that instill religious beliefs. We don't have schools that are instilling Leninism or white supremacy. But just to follow up on that point, you're confident that that kind of school would not be funded, a white supremacist school, because it's outside the bounds of your program. Is that right? Yes, Your Honor. I think it's unfair for a legislature to be expected to legislate against every hypothetical, outlandish situation that could come forward. So it's incredibly unlikely that we would ever have a white supremacy school applying to become part of our public school program. But knowing what I know about Maine and our legislature, a way would be found to ensure that that school is not allowed to participate. Could I follow up? I'm sorry. Go ahead. Would you say the same thing about a school that teaches critical race theory? Whether that school would be eligible? Yeah. So I think that that is something the legislature would have to look at. I mean, that one's closer, because frankly, I don't really know exactly what it means to teach critical race theory. So I think the Maine legislature would have to look at what that actually means. But I will say this, that if teaching critical race theory is antithetical to a public education, then the legislature would likely address that. Justice Kagan? You've been asked quite a number of questions in your time up there about, you know, hard cases, also sort of odd cases. I just want to know, what's the hardest case you have actually, the Department of Education has actually ever been confronted with in this area? So we've never really had a hard case. In 20 years' worth of records, we've identified three schools where there was any issue raised about whether they were eligible. The first school was a seminary school, and so that was clearly ineligible. We told them that, and we never heard back. There was another school that, even though it indicated it was nonsectarian, it disclosed or a Department of Education official learned that, quote, its student life centers around our chapel, and it also had a religious affiliation. And so the state responded that it doesn't look like you're eligible, but if you want to provide us with more information, we'll consider it. And we never heard anything more from that school. And then the third school, the Cardigan Mountain School, was a school that we identified as having a chapel, and so we wrote to the school and said, is this a mandatory chapel service? And they said, well, it is, but the chapel is just the biggest building that we have on campus, and so when we have our student assemblies, that's where we hold them, but there's nothing religious that goes on there. And so we said, okay, that's fine. In 20 years, those are the only situations that we have had where we've had to make those kinds of decisions. I would think all the religious schools I know of, and it could be Catholic schools or it could be Evangelical Christian schools or it could be Muslim schools or Jewish schools of any persuasion, not just Orthodox, but any Jewish schools. I mean, if somebody said to them, are you a religious school, they would have no trouble saying, yes, we are, right? They're not trying to hide this, John. They're proud of it, and they should be. I mean, these schools have an important place in our community, and so they're not trying to hide or pull a fast one over us. They're proud of being a school that instills religion, and they will tell us that. Thank you. Just to follow up on that, so the Cardigan School had a chapel in the middle of campus, and it was allowed to participate. Yes. But the Kent School, which was the second one you mentioned, though you didn't identify it by name, an Episcopal school, said it's not owned or affiliated with the church, but it was not allowed to participate, right? Well, what we told the school is that, based on our review, because you say that your life centers around your chapel, it was not allowed to participate, right? Well, they were invited to provide more information. More information, but they were denied at that time. Yes. Okay, so somebody in Maine, in Bangor, has to sit down and decide, Cardigan good, Kent bad, right? Yes, Your Honor, but these were easy calls to make. Justice Kavanaugh? If the state said that you can use the funds for a secular private school or a Protestant private school, but not a Catholic or Jewish or Muslim private school or any other religious private school, I assume you would agree that would be problematic. Of course, Your Honor. Okay, so when it says that you can use it for a secular private school, but not a Protestant, Catholic, Jewish or Muslim or any other religious private school, you say that's okay, though? Well, I mean, I think that this Court has recognized, for example, in the school prayer cases, that the absence of religion is an animosity towards religion. So what we are trying to achieve are schools that are religiously neutral. And just to be clear, if there were a school that teached sort of anti-religion, that taught kids that there is no God, that you should reject all religion, that school wouldn't be eligible either. What we want is religious neutrality. But the problem, I think, and the tension with what you just said as to those two questions, is that our case law suggests that discriminating against all religions as compared to secular, comparable secular, is discriminatory just as it is discriminatory to, say, exclude the Catholic and the Jewish and include the Protestant. And so it's not exclusion of religious people and religious institutions from public benefits solely because they're religious is itself discriminatory. We said that Trinity Lutheran said odious to our Constitution. How do you deal with that? So I think there's a nuance going on here that I just want to make sure I can clarify, that I think that there is a difference between sort of state regulations, in other words, like state prohibitions, and state programs that are providing funding. And so I think when it comes to prohibitions, a state can't discriminate based on status or use. So you can't say a person can't be Catholic, and you also can't say that a person can't take communion. I also think when it comes to subsidy programs, there you can't discriminate based on status. So you can't say that we have a playground program, but you're not eligible if you're religious. But I think that there's a fourth category, and the fourth category is a subsidy program where the subsidy is being used for a specific purpose and it excludes purposes that are contrary to what the government is trying to establish and are going to be used to directly advance religion. I think that is the one very narrow category where there is a real distinction between status and use. One last question, which is to pick up on Justice Breyer's questions earlier, which I think identified a real issue here, which is strife that is created. But what do you say to those who would say by excluding someone who's religious from a state program and creating this feeling of exclusion for people who are told, your school isn't good enough solely because it's religious, go to Exeter or Andover, but you can't go to the Bangor Christian or the DeMatha or whatever the religious school is. Doesn't that also create a possibility of strife? So a few points there, Your Honor. I think what the real strife would be, first of all, I think there'd be strife among parents who live in districts that have public schools or contract with schools because I think the strife there would be how come I can't send my kids to religious schools at public expense, but these other kids can? So I think that's one source of strife. I think another source of strife would be trying to explain to taxpayers in Maine why your money is being used to go to a school that teaches that boys are better than girls, that actively discriminates against certain protected classes. So I think that's a second element of strife. But I think the other point I want to make is we are not telling people that you can't go to a school because you're religious. There are plenty of people in Maine who want to send their kids to religious schools for reasons wholly unrelated to the religious aspects of the school. It might be because they have a better hockey team or they have better academics or they just have more discipline, and we tell the same thing to those parents. It's not that you're religious that you can't go to that school. It's just those schools aren't eligible for our program. Appreciate your answers. Thank you. I have a question, but I have one quick follow-up to an answer you gave, Justice Kavanaugh. You said that if a private secular school taught that all religions were bad, that all religions were bigoted, that they would not be eligible for participation in Maine's program. Why? That's not sectarian, is it? Well, the goal of the program is religious neutrality. And so, you know, we've never heard of a school that's sort of anti-religious, a school that teaches that all religion is bad. But it's clear that such a school would not be religiously neutral. And so because the whole purpose of the program is to – The statute says non-sectarian. It doesn't say religiously neutral, right? Well, that's true. But I think that the spirit and purpose of the program – and we've talked about this with the commissioner of the Department of Education, and her position is the same as ours, that a school that is anti-religious is not religiously neutral, and so it would not qualify for this program. Thank you. And my question is as follows. It kind of goes back to Justice Thomas' questions about rough equivalent of a public school. So all schools, in making choices about curriculum and the formation of children, have to come from some belief system. And in public schools, the public school, the school boards, the districts, are making that choice, this choice of classes to be taught and the kind of values that they want to inculcate in the students. Is there any kind of – I mean, how would you even know if a school taught all religions are bigoted and biased, or, you know, Catholics are bigoted, or, you know, or we take a position on the Jewish-Palestinian conflict because of our position on, you know, Jews, right? How would they even know? Because it's my understanding that in choosing whether a nonsectarian school can be funded or not, you're not engaging in that kind of oversight about what the belief systems are of the school. So long as they're not sectarian, it's a thumbs up. So I will answer that question, Your Honor. Obviously, I will answer your question. But I just want to make this point first because this might be lost in the record. Over 99.8% of children in Maine go either to a public school or one of what we call the Big 11, which are schools that enroll at least 60% publicly funded students, but in reality enroll more like 95% publicly funded students. So it's only 0.2% of students that are going to other private schools. And the Department of Education is very familiar with the curriculum at the Big 11. So the department is very comfortable that when it comes to those schools where almost every student is going, we know what's being taught there. But to answer Your Honor's question, there is a process that schools have to go through to become part of our program. And through that process, if Department of Education officials sees information that the school seems to be teaching anti-religious views, that would raise a red flag and that would result in the kind of increase. But it was my understanding that that wasn't part of, just based on the record, and I may not understand it, but as it was laid out in the brief, it was my understanding that if the school was accredited, that there weren't particular curricular requirements the school had to satisfy to be eligible for participation in the program. You know, a school, for example, could be single sex. It didn't have to be co-ed, and I assume all the public schools in Maine are co-ed. I mean, it didn't have to match up along all of those metrics, and that there was no formal examination into what kind of values that the school was seeking to inculcate in students. That is true, but what the Department of Education does when it gets a new school applying is it does a little homework. And so it'll go to the school's website and say, okay, I've never heard of this school before. I want to learn a little bit about it. Or maybe it takes a look at the student handbook. And, you know, if the first sentence in the handbook says that our school is designed to promote white supremacy interests or our school is designed to promote anti-religion, that is going to be a flag that's going to get tripped, and that's going to result in the kind of inquiry. So you're absolutely right, Your Honor, that the schools are not submitting their curriculum to us as part of this process. And there's no visit to the school. There's no talking to the teachers. It's just kind of what you can find on the website, and that's not pertinent to the statute because the statutory requirement is simply sectarian, non-sectarian. Yeah, I mean, in just the run-of-the-mill cases, these schools are well known to us. Okay, I understand the Big 11, but I think you're answering my question. But that's true for all schools. Okay. Thank you, Counsel. Mr. Stewart. Thank you, Mr. Chief Justice, and may it please the Court. The judgment of the Court of Appeals upholding Maine's sectarian school exclusion should be affirmed. That is so for three basic reasons. First, the government has far greater latitude when it simply declines to fund particular speech or religious exercise than when it opposes affirmative barriers to that speech or exercise. Second, Maine has a legitimate anti-establishment interest in declining to fund the religious exercise in which Temple Academy and BCS engage, even if the federal establishment clause would permit the state to fund those schools. Third, the religious instruction these schools provide is, by the school's own account, not severable from the secular components of their instructional programs. I welcome the Court's questions. Mr. Stewart, what exactly is an anti-establishment interest, and where does it come from? The framers adopted the establishment clause out of concern that excessive closeness between government and religion could harm both government and religion and cause public discord. And when we refer to an anti-establishment interest, what we mean is state, local, and the federal government should have significant latitude, the play in the joints to which Justice Kagan referred, to attempt to prevent those harms from occurring, even in circumstances where the federal establishment clause would not compel them to act. For example, this Court has held that state and local legislatures can begin their sessions with a brief prayer. But I think it would be extravagant to suggest that any legislative body is required to do so. If a particular state or a particular local legislature said, within our jurisdiction, this practice has caused more harm than it has good, it has caused discord, people believe that we are preferring particular religions even though that was not our intent, it could discontinue the practice. It would be going beyond what the federal establishment clause requires, but it would still be pursuing legitimate anti-establishment interests in the sense of attempting to prevent the general harms at which the establishment clause is directed. And I'd say it's entirely clear that's the way it works on the free exercise side. That is, it's uncontroversial that governments can do more to accommodate religion than the free exercise clause requires. And so sometimes this is done at a fairly particular level where there's a specific state law, a specific prohibition, and a specific religious exemption. Sometimes it's done at a more wholesale level, like with RFRA and RLUIPA, where the Congress says, in a wide variety of contexts, you have to make certain accommodations to religious practice, even though the free exercise clause itself would not require that. It's natural in that circumstance to speak of the government vindicating free exercise values or pursuing free exercise interests, even though the free exercise clause doesn't compel that sort of action. And as Justice Kagan also suggested, different states and localities could decide to do it differently. One state could decide, we will adopt religious exemptions to generally applicable laws only when the free exercise clause requires us to do that. Another state or locality could say, we're going to be significantly more accommodating because that's more in keeping with our traditions, and it's more in keeping with what we perceive to be the likely public reaction to the various steps that we might take. So as the Court has often emphasized, the establishment clause and the free exercise clause, they may in some sense be in tension, but they don't compel a single course of action, that there is room for play in the joints, room for the government to exercise discretion as to what balance it wants to strike. The next thing I want to say is, this is a case about what the government has to subsidize, what it has to fund. It's not a case about the government either imposing affirmative restraints on religion or denying generally applicable benefits to persons based on religious exercise outside the program. And I did want to speak to the question that Justice Gorsuch raised about the part in our brief that said parents can still send their children for religious instruction after school or on weekends. It was not our intent to suggest that most religious parents will or should regard that as a fully satisfactory alternative. Our principal point— In fact, that would be pretty offensive to religious beliefs, right? We are not trying to tell the parents what they should do with their children. And you'd agree that in Thomas, for example, this court's made clear that you don't have to choose between receiving a public benefit and your faith, right? That's correct, but the question is not whether you can be denied the unrelated benefit based on your faith or based on your religious practice. It's whether the government has to subsidize the religious practice itself. Fair enough, but once it creates the program, here we have a program that's been created, and I think that goes back to the Chief Justice's point that maybe they didn't have to create a program. But once they do, to suggest that you don't have to choose between participation in the program and your faith because you can send your children to Sunday school or to a Bible study program at night seems to suggest favoritism toward religions. Just react to this. Seems to favor religions for whom that is an adequate substitute and discriminate against religions for whom that is not an adequate substitute. I think the state is behaving neutrally in the sense that it says, we will fund secular education, we will not fund religious instruction and inculcation. And it may be that to members of some religions that will be a greater practical burden than to others, but that doesn't... So to the Orthodox Jewish family, it is a burden, and to the Protestant family, it may not be. I guess I would speak... You agree that's the practical reality of the program. I mean, obviously parents who would like to send their children to religious schools full time during the day are burdened by this rule in a way that parents who have no interest in doing so would not be. But to speak to a hypothetical that the Chief Justice raised, if, for instance, the state decided we will provide aid for refurbishing athletic facilities and it will be available to secular and to religious schools alike. And some religious schools have robust athletic programs and they would benefit significantly from the assistance. Another religious school might say participation in athletics is contrary to our religious values. This money is useless to us if it's confined within those parameters. We would like the money to use it for something that is as important to us as athletics is to some other schools. Clearly they have no valid free exercise claim. The state has chosen to subsidize certain activities and not others. It's done so on a religiously neutral basis. It may be that that aid will be, practically speaking, more valuable to members of some religions than to others. But that doesn't create a constitutional violation. But at its core, Mr. Stewart, you're suggesting that with, say, two neighbors in Maine, in a neighborhood, and there's not a public school available, and the first neighbor says, we're going to send our child, children, to a secular private school, they get the benefit. The next-door neighbor says, well, we want to send our children to a religious private school, and they're not going to get the benefit. And I don't see how your suggestion that the subsidy changes the analysis. That's just discrimination on the basis of religion right there at the neighborhood level. Well, first, as Mr. Taub said, it's not discrimination based on the religion of the parents. Some parents obviously send their children to religious schools because they share the religious values. Other parents may send the children to religious schools for a combination of other reasons. And so there is a disparity in treatment. It's not necessarily a disparity based on the religion of the parents. Well, that's slicing it pretty thin in the real world, I think. It's discrimination against the different schools because of the religion, and people who prefer those schools prefer religious schools over secular schools. But I think still the response is the state is behaving neutrally in the sense that it will fund secular education and not religious education. And that seems especially appropriate in a program like this one that, as Justice Kagan was saying earlier, it's not intended to provide the broadest range of possible choices. It's intended to provide a substitute for public education. Why isn't it treating people neutrally to tell them you're all equal citizens without respect to your religion, and so, too, all the schools that are accredited are equal without respect to their religion, whether you're secular, Catholic, Jewish, what have you, you're all going to be treated equally. Isn't that the neutral position is to suggest your religion does not affect your qualification for a particular public benefit? Your religion or lack of religion doesn't affect your qualifications in our society. I mean, first, the state, as your question pointed out earlier, certainly couldn't distinguish among religions. They couldn't provide the funds to the Catholic school. Okay, and to stop you there, I think the lesson of some of the cases is discriminating against all religions versus secular is itself a kind of discrimination that the court has said is odious to the Constitution, at least in certain context. I think that's a valid general principle. I think the question is whether to decline to fund religious instruction while you are funding secular instruction is a form of discrimination. There is a sort of secular analog to this where, in cases like Regan and in Camerano versus United States, if a federal or state tax code says a business can take a business expense deduction for the money it spends advertising its product, but it can't take a deduction for lobbying expenses or for expenses on electoral advocacy. A distinction like that doesn't rest on any idea that electoral advocacy and lobbying are disfavored speech or that they are less important. To the contrary, they're the most important types of speech. But the government in the secular sphere can legitimately decide that precisely because the topics addressed in lobbying and electoral advocacy are so important and because there is such a diversity of views on those subjects, the government is going to stay clear of anything that looks like funding or subsidizing that speech. And historically, the government has had the same latitude with respect to religious inculcation. It can't penalize people in some unrelated sphere because they have engaged in religious instruction of their children, but it can decline to fund the religious instruction itself. If the law like this drew a distinction between schools that teach that all religion is bad and schools that teach that religion is good, would that be permissible in the view of the government? No, it would not be. I think essentially for the same reason that a law that provided the money to Catholic schools but not to Jewish schools would be no good. It would be a denominational preference. Do you see anything in the main statute that would rule out a subsidy for a parent who sends a child to a school that teaches all religions are bad? I don't see anything in the main statute as currently written that would naturally be construed in that way. Either the Department of Education or a court in Maine could adopt a limiting construction or I think more likely as Mr. Todd said, if that became a prevalent practice, the legislature could step in. So while we don't think it would be constitutional for Maine to distinguish on that basis, we don't think that the absence of an express provision in the statute to that effect is a basis for striking the statute. Don't we have to judge the constitutionality of the statute as it now stands? I think we should be asking, is the statute constitutional as applied to these particular petitioners? And if these petitioners could point to an example in which a school was approved for funding even though it provided atheistic or anti-religious instruction, then that might be a valid basis for an as-applied claim. But the theoretical possibility that could happen is not a ground for invalidating the statute. And obviously the court has dealt with a lot of funding programs and a lot of issues under both the Establishment Clause and the Free Exercise Clause deciding certain practices are constitutional or not. I don't know of any case in which the court has said the absence from this statute of some express exclusion for atheist schools is itself a basis for striking the law down. If I may, I'd like to say just one thing. I do have one question. I just want to confirm my understanding. I didn't see in the government's brief any strict reliance or suggestion the court should rely on a status use distinction. Rather, I saw this analogy to government speech. Is that right? Well, I think we are advocating the status use distinction, but not the analogy to government speech so much because I don't think it's necessary to treat this as government speech. We are relying on the principle in the Free Speech Clause cases that the government has substantially more latitude when it defines a function. I'm sorry. That's what I meant to say, as opposed to a strict reliance on a status use distinction. I think our view is the status use distinction is just different words for the same concept. The government wouldn't. I mean, maybe it would. Does the government see a basis for distinguishing between attacks on persons who wear yarmulkes as opposed to attacks on Jewish persons, to borrow from one of our cases? No, but we don't view the status use distinction as being based, as Justice Kagan was saying earlier, on a distinction between religious belief and religious conduct. We think the status use distinction means, on the one hand, the state can decline to fund your religious exercise, but it cannot decline to give you an unrelated benefit based on the fact that you have engaged in religious exercise outside the program. Thank you, Mr. Stewart. What is your answer to the questions I posed to your friend from Maine about the two churches? One that doesn't have a religious interest in infusing the school with its religion, or it does. It's religious value in service to others, and they're doing that by providing a perfectly secular school. And the other that has the religious teaching that it should infuse its children with the values of the faith, and they have a school like that. As I understood it, we have the former school that can participate in this program, but the latter cannot. That is correct, and I think even though it might appear in one sense to be discriminatory, it actually avoids a more insidious form of discrimination. That is, there are a lot of circumstances in which the government decides to fund or subsidize activities that it believes to be in the public interest. And the general rule is, as long as you are prepared to do those things, you're entitled to the funding, whether you're religious or not. And if we said that the person who did those things with a religious reason in mind is going to be treated differently from the person who did them with purely secular motivations, that would be problematic. And to take your hypothetical and compare it to a situation in the public schools, as Mr. Taub was pointing out, public schools attempt to teach virtues like honesty, trustworthiness, kindness, consideration for those less fortunate. And certainly those are essentially secular values. They certainly correspond to values that many people hold as a matter of religious conviction. But there's no question those values could be taught in the public schools. And if a particular public school teacher was especially committed to those values because of her religion, that wouldn't be a problem. But if the teacher at the public school said, you should behave in this way because that was the way that Jesus Christ behaved and he was the son of God, that would be problematic. We would look at the content of the instruction the public school teacher was providing, not her internal motivation for speaking as she did. Thank you. Justice Thomas? Justice Breyer? I might ask this because it's related to what Justice Kavanaugh said and what you're saying. I mean, it is discriminatory against religion. But I think the establishment clause problem or interest underlying it forever has been beware if the government gets too involved. One, people will think the government favors some things as opposed to others and that that will cause strife. Two, the Vietnamese boat people will have no problem in Los Angeles, but they sure will in Maine because there aren't enough of them. And there are a lot of religious people who will say, why are you preferring the Catholics or the Jews to the Vietnamese boat people? And you say, I have an answer to the discrimination. There aren't enough of you. Oh, oh, I see. Minority. OK, but there's a third one which you haven't mentioned, which I learned out of a case in the First Circuit, which is really tough. Religious reason for teaching about Honduras in the geography class in way X school board says way X. You can't do it. You're disqualified. The teacher. They say, but that's how we're supposed to do it. OK. And I have never seen emotions rise so high in a courtroom. And suddenly you get into teaching that involves worship and religious principles. You don't know what kinds of interreligion or why are you doing it for the religious people, but not me. I'm not religious. The strife that can be involved. All right. I thought that was a good reason why Zelman was wrong, but my colleagues did not. Now we have, in fact, a different issue. Can a state have a different judgment than Ohio? Can Maine differ from Ohio? That's the issue. All right. Hey, we have a principle. We have 50 states and a huge country. And so why not, I say, let some decide one way, let some decide the other. They have different kinds of populations. Now, you see what I have. I have a great theory. Is there any law supporting that? I think there's a law that I referred to in the Justice Kagan referred to the idea of the play in the joints. The idea that there is a fairly significant sphere of activity in which the state can legitimately choose either to fund or not to fund religious institutions. And in making that decision, state and local legislators cannot just decide what would be the best solution for the whole country. Legislators in a particular part of the country can decide where we live, excluding the religious schools would be more likely to be perceived as a form of religious discrimination and to cause turmoil, and therefore we won't do it. In another part of the country, the legislators might say including the religious institutions is more likely to cause strife. Obviously, there are limits. Espinoza and Trinity Lutheran made clear that you can't exclude the institution altogether with respect to secular activities, but there is significant room for regional variation. Justice Alito, if the program allowed parents to send their children to any accredited school anywhere in the country, which is what this program seems to allow with the exception of so-called sectarian schools, how would that cause strife? And add into that the fact we're told that Maine didn't rule out these schools until, for many, many years, parents were permitted to send their children to those schools. Are you aware of a history of strife? Explain. It's one thing to say strife. Could you explain in more concrete terms how you see a potential for religious strife arising out of the acceptance of the petitioner's argument here? First, to speak to the history briefly, it was in 1980 that the Maine Attorney General first analyzed the question. And the Attorney General said, I think it would be unconstitutional under then-extant Supreme Court precedents to fund sectarian schools. And he explained that he meant schools whose dominant purpose is the promotion of religious beliefs. But after Zelman was decided in 2003, the Maine legislature reexamined the question, decided to maintain the bar in effect on the books based on independent reasons. But to speak to the strife point in particular, I think it is likely, contrary to what was said earlier, that allowing the subsidy for religious schools will tend to favor majoritarian religions. Because in order to have a religious school, you have to have more than a single adherent to a particular belief system. You have to have a critical mass of people within the community who are willing to support the school. And so those are going to tend to be religions of majoritarian schools. And there is at least the specter, as Mr. Taub said, of people in the community saying, you are funding religions other than our own, and you are funding religious schools that promulgate beliefs that are antithetical to ours. Justice Sotomayor? I look at the history in this area, and what I see is that at the founding, there weren't public schools. They were self-taught, but most of the schools were private. And yes, there is a history of some states, not all, subsidizing some religious schools. And then we have later, much later, a movement towards public schools. But what I don't see after the creation of public schools is a tradition or history of continued support of religious schools. Am I reading the history right? I mean, I don't want to speak too categorically. I think you're right. There was a movement in the direction of public education. It, of course, wasn't until the 1960s that this court issued the school prayer decision. So it wasn't even until fairly recently that the court said, you can't have an overt religious component in the public schools. So I think what we would draw from the history is different governmental units have done it different ways at different points in time, and that may weigh in favor of an argument that particular practices should be permissible under the Establishment Clause, but it shouldn't preclude particular states from deciding, we don't want to do this here. Thank you. Justice Kagan? Mr. Stewart, how should we analyze the standing question here? I mean, the petitioners here say, look, what this legislation does is to prevent us from even seeking a school that would accept the money. And so the fact that we haven't come up with a particular school that would accept the money and that meets our religious criteria is irrelevant. Why isn't that right? I mean, the cases they were relying on were the Northeastern Florida general contractor's case and Heckler v. Matthews, which I believe was a sex-based disparity in public benefits. And in both of those cases, the plaintiff himself was saying, I have suffered direct overt discrimination in the sense that the law I am challenging subjects me to unfavorable treatment based upon my own characteristics. And we don't have that here. Maine law doesn't distinguish between religious and non-religious parents. The petitioners are not challenging any aspect of the Maine statute that defines the class of parents who can seek the tuition subsidy. The provision it challenges is the provision that says, what characteristics does the school have to have in order for the school to get approved school status and potentially be eligible for the funds? And I think it's entirely clear that if the schools were the plaintiffs and all they were willing to say is, if this is struck down, we would think about accepting the money. That wouldn't be good enough under a case, the more recent case like Carney v. Adams. And so if the plaintiff's claim is essentially derivative of an alleged constitutional wrong done to the schools, it would be anomalous to say that the plaintiffs have standing, even though the schools do not. Justice Gorsuch. With the government, I can't believe it would. But with the government to permit or argument for discrimination against persons based on an unsupported hypothetical possibility of strife, if the discrimination were based on race or sex or some other basis like that. It depends on what you mean by discrimination. No, ordinarily you could not impose affirmative disadvantages, but government can make funding decisions all the time, can decide what activities to subsidize and what activities not to subsidize based on fairly speculative inferences about what results might occur. That's the whole point of the court's free speech cases that say the government has a lot more latitude when it's making funding decisions. Including on the basis of sex and race and other personal characteristics like that? No, and if the statute here said that religious parents generally or parents of a particular religion can't apply for the school subsidy, that would clearly be no good. Here what the state is saying is we don't want to subsidize. If we viewed the statute as you just described it, it would be no good in your terms. If you read the statute to say that religious parents can't seek the subsidy even for a secular school, then the statute would be unconstitutional. But nobody is reading that way. Petitioners are not arguing that that's what the statute says. Justice Kavanaugh? I just want to follow up on that question from Justice Gorsuch. I think it's important on this public discord or strife issue to emphasize that, as I understand it, they are seeking equal treatment, not special treatment. They're saying don't treat me worse because I want to send my children to a religious school rather than a secular school. Treat me the same as the secular parent next door. I think that's what they're asking for is equal treatment. Special treatment cases are where you're asking for an exemption from generally applicable law. That's the Smith kind of cases. Those are hard cases. But here I think all they're asking for is equal treatment. And the question then becomes public discord from equal treatment. To follow up on Justice Gorsuch's question, how should we think about that? They are certainly characterizing what they are asking for as equal treatment. But Maine's view and our view is they are seeking a benefit different from the one that Maine is willing to provide. Maine is willing to provide a secular education, an education that is the rough analog to what the public school would give you at state expense. It's not willing to pay for religious inculcation. And so it's like a case where the school that doesn't believe in athletics says I'm being treated unequally because you are willing to fund a thing that is important to some other schools but not to me. That's not the kind of equal treatment that either the free speech clause or the free exercise clause would prohibit. Thank you. Thank you, counsel. Thank you. Rebuttal, Mr. Bendis? Starting with the United States arguments, this absolutely discriminates against parents. It says you can get an otherwise available public benefit you are statutorily entitled to so long as you don't exercise a right that this court recognized in Espinoza. You get one or the other. If you're the Carsons, you can afford it. Great. You keep your free exercise rights. If you're the Nelsons, you can't afford it. You forgo your free exercise rights. That is discrimination around how you slice it, and this court should not allow that to stand. Now, my friend from Maine, you know, throughout the briefing has recast the benefit in this case. Now we're recasting the facts and saying based on how the spirit, I believe I heard correctly, how the spirit of the program works. Well, the spirit of the program doesn't look at whether or not religious instruction or activities are optional. After all, the Kent school was excluded. Chapel was optional. Theology was offered. No one had to take it. Yet they were excluded. My friend from Maine also says that this only triggers, the sectarian exclusion only triggers if the school is actually instilling, inculcating, requiring you to believe. Well, what did the commissioner testify? That it's triggered if the school promotes the faith or belief system with which it is associated and or presents the material taught through the lens of this faith. You don't have to say you must believe this to be excluded. Philosophy class, apparently you can teach Aquinas and Augustine. But if you say Augustine and Aquinas were right, then apparently you're out. Again, based on the decision of a bureaucrat in Augusta about whether the way the material is being presented is through the lens of faith. And the last thing I would say, the benefit here is not a free public education. It's certainly not free. Ms. Porter's charges $66,400 a year. You have to pay much of that, most of that, if you go there with a tuition benefit. This is not a free education. Nor are the participating private schools like a public school or providing a public education in any sense of the word. They need not follow the public school curriculum. They can discriminate on bases that public schools may not. They can, as I just mentioned, charge tuition to the tune of $66,000 a year. They need not hire state certified teachers, which means public schools must do. They can be run by religious organizations and orders. Obviously a public school in Maine may not. It can be unlike a public school in every one of those respects and participate in this program. But a religious school that is like a public school in every one of those respects is excluded if it teaches a single religion class or presents material that someone in Augusta determines to be presented through the lens of faith. That is discrimination. This court should not allow it to stand. It should hold the sectarian exclusion unconstitutional. Thank you. Thank you, counsel. The case is submitted.